## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| CHI-CHI'S, INC., et al., | : | Case No. 03-13063 |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | Adv. Pro. No. 05-52726 |
| SYSCO CORPORATION and | : | |
| THE SYGMA NETWORK, INC., | : | |
| | : | |
| Appellants, | : | Civil Action No. 06-169-KAJ |
| | : | |
| v. | : | |
| | : | |
| CHI-CHI'S, INC., | : | |
| | : | |
| Appellee. | : | |

**REPLY BRIEF OF SYSCO CORPORATION AND THE SYGMA NETWORK, INC. IN
SUPPORT OF THEIR APPEAL OF THE BANKRUPTCY COURT'S JANUARY 18, 2006
ORDER FINDING THAT RULE 41 DOES NOT BAR FURTHER PROCEEDINGS
AGAINST SYSCO CORPORATION AND THE SYGMA NETWORK, INC.**

June 23, 2006

Mark E. Felger (DE No. 3919)
Jeffrey R. Waxman (DE No. 4159)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
-- and --
Philip G. Kircher
Aaron Krauss
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103-3508
Telephone: (215) 665-4181
Facsimile: (215) 701-2381

*Attorneys for Sysco Corporation and
The SYGMA Network, Inc.*

**TABLE OF CONTENTS**

Page

I.    ARGUMENT. ................................................................................................................. 1

      A.    Chi-Chi's And Empire Are The Same "Party." ....................................................... 1

      B.    Chi-Chi's And Empire Attempted To Assert The Same Claims. ........................... 4

      C.    Chi-Chi's And Empire's Notices Of Dismissal Cannot Be Deemed To Be
            The Equivalents Of Stipulations Of Dismissal. ..................................................... 6

II.   CONCLUSION. .............................................................................................................. 6


I.    ARGUMENT. ................................................................................................................. 1

II.   CONCLUSION. .............................................................................................................. 6

## TABLE OF AUTHORITIES

Page

### CASES

*Avemco Insurance Co. v. Cessna Aircraft Co.*,
    11 F.3d 998 (10th Cir. 1993) ..................................................................................2, 4, 6

*Barnes v. Independent Automobile Dealers Association of California Health
and Welfare Benefit Plan*,
    64 F.3d 1389 (9th Cir. 1995) ..............................................................................5

*Bill Gray Enterprises, Inc. Employee Health and Welfare Plan v. Gourley*,
    248 F.3d 206 (3d Cir. 2001)............................................................................1, 2

*Funkhouser v. Chi-Chi's, Inc.*,
    2005 WL 2545300 (W.D. Pa. October  7, 2005) ...............................................5

*Catalfano v. Higgins*,
    55 Del. 470, 188 A.2d 357 (Del. 1962) ......................................................2, 4-5

*Chovan v. Wheeling-Pittsburgh Steel Corp.*,
    373 A.2d 136 (Pa. Commw. Ct. 1977) ..............................................................5

*Commercial Union Insurance Co. v. S&L Contractors, Inc.*,
    2002 WL 31999352 (Del. Com. Pl. Nov. 8, 2002)............................................1

*Employers Mutual Liability Insurance Company of Wisconsin v. Tutor-Saliba Corp.*,
    17 Cal. 4th 632, 951 P.2d 420 (1998)........................................................... 1-2

*Government Employees Ins. Co. v. Winsett*,
    153 S.W.3d 862 (Ky. Ct. App. 2004) ...............................................................3

*Levitt v. Simco Sales Service of Pennsylvania*,
    50 Del. 557, 135 A.2d 910 (Del. Super. Ct. 1957) ...........................................2

*Louisville & N.R. Co. v. Mack Manufacturing Co.*,
    269 S.W.2d 707 (Ky. 1954)...........................................................................2, 5

*In re: MK Lombard Group, Ltd.*,
    2005 WL 735993 (E.D. Pa. March 31, 2005)....................................................4

*Malone Freight Lines, Inc. v. Johnson Motor Lines, Inc.*,
    52 Del. 286, 156 A.2d 788 (Del. Super. Ct. 1959) ...........................................2

*Ohio Casualty Insurance Co. v. Vermeer Manufacturing Co.,*
   298 F. Supp. 2d 575 (W.D. Ky. 2004)................................................................................2

*Sapiano v. Williamsburg National Insurance Co.,*
   28 Cal. App. 4th 533 (1994) ...............................................................................................5

*Southmark Prime Plus, L.P. v. Falzone,*
   776 F. Supp. 888 (D. Del. 1991).........................................................................................4

*Transamerica Occidental Life Insurance Co. v. Aviation Office of America, Inc.,*
   292 F.3d 384 (3d Cir. 2002)............................................................................................2, 6

*United States v. Walters,*
   510 F.2d 887 (3d Cir. 1975).............................................................................................3-4

*Wallis v. W.S.P. Combs, Jr. Agency,*
   565 A.2d 1384 (Del. Super. Ct. 1988), *appeal denied,* 567 A.2d 418 (Del. 1989) .............6

*Watson v. Allstate Insurance Co.,*
   28 F. Supp. 2d 942 (M.D. Pa. 1998) ..................................................................................5

*Wine v. Globe American Casualty Co.,*
   917 S.W.2d 558 (Ky. 1996) ....................................................................................1-2, 5-6

*Works v. Winkle,*
   234 S.W.2d 312 (Ky. 1950)................................................................................................5

*Zurich American Insurance Co. v. Haile,*
   882 S.W.2d 681 (Ky. 1994)................................................................................................5

## MISCELLANEOUS

1A C.J.S. Actions § 248.............................................................................................................3

2 Insurance Claims and Disputes 4th § 10:9................................................................................5

Wright & Miller, *Federal Practice and Procedure* § 1404 ............................................................2

Chi-Chi's, Inc. and Empire Indemnity Insurance Company's arguments as to why Rule 41 does not bar the third lawsuit they have filed against Sysco Corporation and The SYGMA Network, Inc. (collectively "SYGMA") following the dismissal by notice of their first two lawsuits boil down to three contentions:[1]

First, that Chi-Chi's and Empire are different "parties."

Second, that Chi-Chi's and Empire attempted to assert different claims.

Third, since Chi-Chi's and SYGMA discussed the arbitration clause in the Distribution Agreement before the Rule 41 notices of dismissal were filed, those Rule 41 notices are "close enough" to a stipulation of dismissal to preclude the application of Rule 41's "two dismissal rule."

None of these arguments withstand scrutiny. The Bankruptcy Court's judgment should therefore be reversed, and all claims against SYGMA should be barred by Rule 41.

## I.    ARGUMENT.

### A.    Chi-Chi's And Empire Are The Same "Party."

A subrogating insurer stands in the shoes of its insured. *See Bill Gray Enterprises, Inc. Employee Health and Welfare Plan v. Gourley*, 248 F.3d 206, 222 (3d Cir. 2001); *Commercial Union Ins. Co. v. S&L Contractors, Inc.*, 2002 WL 31999352 at *2 (Del. Com. Pl. Nov. 8, 2002); *see also Employers Mutual Liability Insurance Company of Wisconsin v. Tutor-Saliba Corp.*, 17 Cal. 4th 632, 642, 951 P.2d 420, 426 (1998); *Wine v. Globe American Casualty Co.*, 917 S.W.2d 558, 561 (Ky. 1996). Since it stands in the shoes of its insured, a

---

[1] SYGMA notes that, in their briefs, Chi-Chi's and Empire have made numerous incorrect statements regarding the hepatitis A outbreak, the contents and effect of the Distribution Agreement between Chi-Chi's and SYGMA, and the motions to dismiss SYGMA has filed before Arbitrator Rutter and before the California State Court. Since these misstatements are not relevant to the issues presented by this appeal, SYGMA will not address them further.

subrogating insurer can assert whatever claims the insured could have asserted. *See Ohio Casualty Ins. Co. v. Vermeer Manufacturing Co.*, 298 F. Supp. 2d 575, 580 (W.D. Ky. 2004); *Employers Mutual*, 17 Cal. 4th at 639, 951 P.2d at 430. The subrogating insurer is also subject to whatever defenses the insured would have been subject. *See Bill Gray*, 248 F.3d at 222; *see also Ohio Casualty*, 298 F. Supp. 2d at 580; *Employers* Mutual, 17 Cal. 4th at 639-40, 951 P.2d at 430. The end result is that "a subrogee is substituted in place of its insured; it does not acquire greater rights." *Wine*, 917 S.W.2d at 566.

Since a subrogating insured stands in its insured's shoes, and asserts its insured's rights, subject to whatever defenses might be applicable to its insured, a subrogating insurer and its insured are, for all intents and purposes, the same party. *See Avemco Insurance Co. v. Cessna Aircraft Co.*, 11 F.3d 998, 1000 (10th Cir. 1993) (subrogating insurer is the same "party" as the insured for Rule 13 purposes); *see also Transamerica Occidental Life Ins. Co. v. Aviation Office of America, Inc.*, 292 F.3d 384, 392 (3d Cir. 2002) (assignee is the same "party" for Rule 13 purposes); Wright & Miller, *Federal Practice and Procedure* § 1404 ("when an insurer sues as the subrogee of the rights of its insured, defendant has been required to plead any compulsory counterclaims against the insured"). This is why subrogating insurers are permitted to sue in their insured's name, as Empire did in this case. *See Catalfano v. Higgins*, 55 Del. 470, 472, 188 A.2d 357, 358 (Del. 1962).

Since they are, in effect, the same party, the insured and the subrogating insurer are only permitted to bring one suit. *See Malone Freight Lines, Inc. v. Johnson Motor Lines, Inc.*, 52 Del. 286, 292-94, 156 A.2d 788, 792-93 (Del. Super. Ct. 1959); *Levitt v. Simco Sales Service of Pennsylvania*, 50 Del. 557, 559-61, 135 A.2d 910, 911-12 (Del. Super. Ct. 1957); *Louisville & N.R. Co. v. Mack Manufacturing Co.*, 269 S.W.2d 707, 709-10 (Ky. 1954);

*Government Employees Ins. Co. v. Winsett*, 153 S.W.3d 862, 864 (Ky. Ct. App. 2004) ("We begin with the observation that a subrogee's claim is strictly derivative of its subrogor *with no right to independently maintain a cause of action as long as the insured is pursuing the claim*.") (emphasis supplied); 1A C.J.S. Actions § 248.

      In recognition of the rule against splitting causes of action, Chi-Chi's subrogating insurers have admitted that they cannot bring suit separately from Chi-Chi's, and that Chi-Chi's cannot bring suit separately from its subrogating insurers.[2] *See* Scottsdale and Federal's February 28, 2006 brief at 3 ("Because the rule against splitting a cause of action *requires* insured and insurer to bring one action together, Chi-Chi's unilateral decision to pursue arbitration in Pennsylvania under Kentucky law *requires* Scottsdale to intervene in the arbitration or risk being barred from pursuing any of the defendants submitting to arbitration, including SYSCO.") (emphasis supplied); Scottsdale and Federal's April 7, 2006 brief at 8 ("the rule against splitting a cause of action forbids an insurer and insured to proceed independently."); Edson's Declaration in Support of Scottsdale and Federal's April 7, 2006 brief at ¶ 8 ("Chi-Chi's unilateral decision to pursue private arbitration effectively compels Scottsdale to arbitrate its subrogation claims.").

      In footnote 2 of its brief, Empire claims that this Court should not take judicial notice of the admissions Chi-Chi's subrogating insurers have made in the cases they have filed against SYGMA and others in California State Court. The Third Circuit, however, has held that it is proper, when considering an appeal, to take judicial notice of briefs filed in related cases. In *United States v. Walters*, 510 F.2d 887 (3d Cir. 1975), the Third Circuit observed

> "Copies of the briefs and petitions filed in these appeals to the Superior and Supreme Courts of Pennsylvania were not in the

---

[2] SYGMA attached copies of these briefs, which Chi-Chi's subrogating insurers filed in the California State Court action, to its opening brief.

> record before us, a record which, as is too frequently the case in habeas corpus proceedings, is woefully lacking in this and other respects. However, copies of the briefs and petitions to these courts in the aforementioned appeals have been procured, and this court will order them to be included in and made part of the record before us so that the Reviewing Court may have a full and proper record before it. We, of course, take judicial notice of these documents, as the United States District Court could have done."

*Walters*, 510 F.2d at 890 n.**4**.

Based on the Third Circuit's willingness to go out on its own and procure copies of briefs filed in related cases, the District of Delaware has had no problem taking judicial notice of briefs filed in related litigation in California, especially where (as here) copies of those briefs are attached to pleadings before the Delaware Court. *See Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991). The fact that the subrogating insurers filed these briefs in California after the Bankruptcy Court handed down its decision does not alter the fact that this Court can take judicial notice of those briefs. *See In re: MK Lombard Group, Ltd.*, 2005 WL 735993 (E.D. Pa. March 31, 2005).

SYGMA understands, however, why Empire does not want this Court to take judicial notice of the admissions made in California. Having admitted in California that they are legally joined with Chi-Chi's, and that they cannot assert claims separately from Chi-Chi's, the subrogating insurers cannot now claim to be parties that are separate and distinct from Chi-Chi's. *See Avemco*, 11 F.3d at 1000.

## B.    Chi-Chi's And Empire Attempted To Assert The Same Claims.

In their briefs, Chi-Chi's and Empire attempt to convince the Court that, notwithstanding the fact that they used identical language, and included identical counts, in their complaints, Chi-Chi's and Empire sought to assert different claims. Leaving aside the fact that Chi-Chi's never actually says that it has not sought (and is not seeking) the amounts Empire and

the other subrogating insurers paid, as a matter of law, a partially subrogated insured such as Chi-Chi's has the right to bring the entire claim – the subrogated and unsubrogated portions – on its own. *See Catalfano*, 55 Del. at 472, 188 A.2d at 358 ("an insured who has been only partly compensated by his insurer has an interest in the recovery and may sue on behalf of himself and the insurer"); 2 Insurance Claims and Disputes 4th § 10:9 ("the courts are in agreement that, absent a statute to the contrary, the insured is otherwise entitled to bring a lawsuit, both on his or her own behalf and on behalf of the insurer, against the [alleged] wrongdoer for the insured's entire loss."). *See also Zurich American Insurance Co. v. Haile*, 882 S.W.2d 681, 685 (Ky. 1994) ("With workers' compensation statutory subrogation, as with contractual subrogation, the insurer's right is a right to reimbursement, strictly derivative, with no right to maintain the action independently so long as the insured is pursuing the claim."); *Chovan v. Wheeling-Pittsburgh Steel Corp.*, 373 A.2d 136, 139 n.3 (Pa. Commw. Ct. 1977) ("an employer may assert a subrogation claim on the behalf of its insurance carrier").

If the insured could not bring suit for the entire claim – both the subrogated and unsubrogated amount – the requirement that the insured must be made whole before the subrogating insurer can recover would be nugatory. *See Barnes v. Independent Automobile Dealers Association of California Health and Welfare Benefit Plan*, 64 F.3d 1389, 1394 (9th Cir. 1995); *Watson v. Allstate Insurance Co.*, 28 F. Supp. 2d 942, 945 (M.D. Pa. 1998); *Sapiano v. Williamsburg National Insurance Co.*, 28 Cal. App. 4th 533, 536-37 (1994); *Wine*, 917 S.W.2d at 562. Where, as here, either the insured or the insurer brings a claim in which the other has an interest, the proceeds of the suit will be divided after they are collected. *See Catalfano*, 55 Del. at 473, 188 A.2d at 358; *Louisville*, 269 S.W.2d at 709; *Works v. Winkle*, 234 S.W.2d 312, 316 (Ky. 1950).

As a result, Chi-Chi's and Empire did seek, and in fact must have sought, to assert the same claim. *C.f. Funkhouser v. Chi-Chi's, Inc.*, 2005 WL 2545300 at *2 (W.D. Pa. October 7, 2005) (Chi-Chi's and its subrogating insurer had asserted the "same rights," based upon the "same facts," and sought the "same relief"). Rule 41's requirements are therefore satisfied.

### C.    Chi-Chi's And Empire's Notices Of Dismissal Cannot Be Deemed To Be The Equivalents Of Stipulations Of Dismissal.

Finally, Chi-Chi's and Empire argue that, since SYGMA allegedly threatened to invoke the arbitration clause, SYGMA would not be prejudiced if an arbitration were allowed to proceed. Leaving aside the inherent improbability of a plaintiff waiting nearly a year to file an arbitration if there had been an agreement to dismiss litigation in favor of arbitration, the fact remains that there was no stipulation of dismissal. Rule 41 explicitly distinguishes between a notice of dismissal and a stipulation dismissing a case. Chi-Chi's filed a stipulation of dismissal as to Castellini. It filed a notice of dismissal as to SYGMA. There is no injustice in requiring Chi-Chi's and Empire – two sophisticated corporations who have filed numerous lawsuits arising out of this same transaction or occurrence – to bear the consequences of their actins.

## II.    CONCLUSION.

Empire stands in the shoes of Chi-Chi's. As the Kentucky Supreme Court observed, subrogation "was often called the rule of substitution because one legally required to pay the obligation of another became legally entitled to be substituted in the place of the creditor." *Wine*, 917 S.W.2d at 561; *see also Wallis v. W.S.P. Combs, Jr. Agency*, 565 A.2d 1384, 1386 (Del. Super. Ct. 1988), *appeal denied*, 567 A.2d 418 (Del. 1989). Having been substituted for Chi-Chi's, Empire is the same party as Chi-Chi's for Rule 41 purposes. *See*

*Transamerica*, 292 F.3d at 392; *Avemco*, 11 F.3d at 1000. Since both Chi-Chi's and Empire

dismissed claims brought in Chi-Chi's name against SYGMA by Rule 41 notice, they (and

anyone claiming through them) should be barred from filing additional claims.

Respectfully submitted,

Dated: June 23, 2006                          COZEN O'CONNOR

By:        _____

Mark E. Felger (DE No. 3919)
Jeffrey R. Waxman (DE No. 4159)
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
-- and --
Philip G. Kircher
Aaron Krauss
1900 Market Street
Philadelphia, PA 19103-3508
Telephone: (215) 665-4181
Facsimile: (215) 701-2381

*Attorneys for Sysco Corporation and
The SYGMA Network, Inc.*

Westlaw.

Not Reported in F.Supp.2d                                           Page 1
Not Reported in F.Supp.2d, 2005 WL 735993 (E.D.Pa.)
**(Cite as: 2005 WL 735993 (E.D.Pa.))**

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
In the Matter of: MK LOMBARD GROUP, LTD.
**No. Civ.A. 04-2700.**

March 31, 2005.
Allison S. Lapat, David E., Derek and Neil E.
Jokelson, Neil E. Jokelson And Associates,
Philadelphia, PA, for Appellants.

Jami B. Nimeroff, Mary Kay Brown, Buchanan,
Ingersoll Professional Corporation, Bonnie Rae
Golub, Kenneth E. Aaron, Weir & Partners LLP,
Philadelphia, PA, Salene R. Mazur, Pittsburgh, PA,
for Appellees.

Allen B. Dubroff, Elkins Park, PA, pro se.

Frederic J. Baker, Philadelphia, PA, pro se.

*MEMORANDUM OPINION*

DAVIS, J.

**\*1** Presently before the Court is an appeal from a
May 14, 2004 Order entered by the Honorable
Stephen Raslavich, United States Bankruptcy Judge,
sustaining the objection of appellee Philip Lombard
Street ("appellee") to the claim of appellant
Silverman ("appellant") against the bankruptcy estate.
For the following reasons, this Court affirms in part
and vacates in part the judgment of the bankruptcy
court, and remands for further proceedings consistent
with this opinion.

1. Factual and Procedural History

Debtor MK Lombard Group I, Ltd. ("debtor") is a
limited partnership with two individual general
partners, Stephen Goldner ("Goldner") and Richard
Kline ("Kline"). Debtor was organized to acquire and
to develop property located at Third and Lombard
Streets in Philadelphia, Pennsylvania (the
"property").

In order to acquire the property, debtor undertook
mortgage obligations to Republic First Bank
("Republic First") and MKLG Holding Partnership,
Ltd. ("MKLG"). Pursuant to the mortgage, MKLG
retained a lien on every lot, and MKLG and debtor
executed a judgment note (the "note") that provided
for the release of one lot per month upon MKLG's
receipt of a specified monthly payment. (*See*
Judgment Note, attached as Ex. 15 to Appellee's
App.). Due to the costs associated with owning and
developing the property, debtor began negotiating the
sale of the property with Abraham Woidislawsky
("Woidislawsky") and Leon Silverman
("Silverman"). Woidilawsky and Silverman, along
with Goldner, were future partners in a "to-be-
formed" corporate entity, known as Gaskill Street
LLC ("Gaskill"), that would eventually purchase the
property.

A. June Agreement

Woidilawsky, on behalf of Gaskill, and debtor
entered an agreement of sale on June 10, 2002 ("June
agreement"). (*See* June Agreement, attached as Ex.
16 to Appellee's App.). Pursuant to the June
agreement, Woidislawsky advanced to debtor the
amount of $100,000 to make mortgage payments to
MKLG and Republic First. (*See* Transcript of
December 18, 2003 Bankruptcy Court Hearing
(hereafter referred to as "Tr."), attached as Ex. 27 to
Appellant's App., at 25-26). In addition to the
$100,000 advance, a second advance of $25,000 was
provided by appellant to refund partially a $50,000
deposit made by a prospective purchaser of a home
on the property. (Tr., at 31). The $25,000 advance
was personally guaranteed by Goldner. (*See* Tr. at 25,
31, 156).

Closing did not take pace on the designated closing
date. Although both parties accused the other of
defaulting under the agreement, each side remained
interested in completing the sale of the property.
Debtor retained the $100,000 and $25,000 advances
(collectively the "June advance"). (Tr. at 38).

B. September Agreement

A new agreement (the "agreement") was executed
between appellant, on behalf of Gaskill, and debtor
on September 28, 2002. The agreement replaced the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 735993 (E.D.Pa.)
**(Cite as: 2005 WL 735993 (E.D.Pa.))**

June Agreement in its entirety. It expressly released all claims by and between the parties that may have arisen from the June agreement. (*See* Agreement, attached as Ex. 14 to Appellee's App., at ¶ 30). Specifically, appellant released his right to the advances of $125,000 made pursuant to the June Agreement, except upon the occurrence of certain conditions. (*Id.*).

1. Closing Date

**\*2** The agreement set a closing date of October 30, 2002, with a stipulation that "time was of the essence." (*Id.,* at ¶ 4.1). The agreement permitted purchaser to extend the closing deadline if three conditions were satisfied: (i) appellant paid to MKLG the next installment due under the judgment note ten days prior to the closing date; (ii) appellant ensured that Republic First would not exercise any remedies under its mortgage notes; and (iii) debtor had not filed a voluntary bankruptcy petition, nor had an involuntary petition been filed against debtor. (*Id.,* at ¶¶ 3.2, 4.1).

2. Purchase Price

Pursuant to the agreement, appellant agreed to pay the purchase price of the property at the time of closing. The purchase price included the debt to MKLG, which was secured by the note and mortgage. (*Id.,* at ¶ 2(a)(ii)). However, the agreement also provided that the debt to MKLG "may be assumed at Closing and not paid off, with the consent of MKLG, which consent Seller shall obtain." (*Id.*). Furthermore, in order to keep current the debtor's note with MKLG, appellant contributed $32,788 toward the payment ("September advance"), which was due on or before September 30 2002. (Tr., at 56-57).

In exchange for payment of the purchase price, debtor agreed to convey good and marketable title to the property. (*Id.,* at ¶ 3.1). Furthermore, debtor represented and warrantied that all liens and judgments associated with the property were disclosed through the various schedules accompanying the agreement. (*Id.,* at ¶ 10.2(h)).

3. Financing

Appellant secured financing for the transaction through Independent Mortgage, which issued a final commitment letter on October 8, 2002. (Tr., at 100; *see* October 8, 2002 Loan Application, attached as Ex. 25 to Appellee's App.). This commitment for

financing was predicated upon: (i) MKLG providing consent for appellant to assume the mortgage; and (ii) the release of five lots from the lien of the MKLG mortgage, so that Independent Mortgage would have a first lien on those five lots. (*Id.*). Appellant notified debtor of the content of this commitment letter. (Tr., at 87).

C. Termination of the September Agreement

Despite knowledge of the content of appellant's commitment letter from Independent Mortgage, debtor was unable to secure the consent of MKLG. (Tr., at 86-87). Indeed, MKLG refused to permit appellant to assume the mortgage of the property, and, instead, demanded immediate payment of the outstanding balance of the mortgage--an amount in excess of $1.5 million. (Tr., at 16). Following a meeting with Ms. Kats, the president of MKLG, Kline notified appellant prior to the closing date that "there was no way she was going to cooperate." (Tr., at 88-89).

Closing did not take place on October 30, 2002, as appellant did not have the appropriate financing in place. Appellant did not give formal written notice of any alleged defaults, such as debtor's failure to secure the consent of MKLG, prior to or after closing. (Tr., at 38, 127-128). Nor did appellant seek to extend the closing date in accordance with the agreement. (Tr., at 127-128).

**\*3** On October 31, 2002, debtor sent a notice of default declaring the agreement terminated by virtue of appellant's failure to close by the closing date or to extend the window for closing. (*See* October 31, 2002 Letter, attached as Ex. 17). This notice of default was accompanied by a November 5, 2002 letter from appellant proposing terms for a revised agreement of sale and requesting the status of debtor's negotiations with competing buyers. (*See* November 5, 2002 Letter, attached as Ex. 18 to Appellant's App.).

D. Bankruptcy

On November 26, 2002, an involuntary bankruptcy petition was filed against debtor by several of its creditors in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court"). (Doc. No. 1). On September 9, 2003, the bankruptcy court entered an order confirming debtor's Amended Plan of Reorganization dated August 28, 2003 (the "Plan"). (Doc. No. 27). The Plan provided for the conveyance of the Property to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 735993 (E.D.Pa.)
**(Cite as: 2005 WL 735993 (E.D.Pa.))**

Page 3

appellee Philip Lombard Street L.P. ("appellee"). (*See* Plan, attached as Ex. 11 to Appellant's App.). In consideration for the conveyance of the property, appellee agreed to satisfy 100% of the creditor claims. (*Id.; see* Bank. Op., attached as Ex. 2 to Appellant's App., at 2). The Plan vested authority in appellee to prosecute objections to the claims asserted by debtor's creditors. (*Id.*).

On March 14, 2003, appellant, on behalf of himself and Gaskill Street, LLC, filed a proof of claim against the debtor in the amount of $157,788, which consisted of the $125,000 June advance and the $32,788 September advance. (*See* Proof of Claim, attached as Ex. 5 to Appellant's App.). On March 26, 2003, Woidislawsky also filed a proof of claim against debtor in the amount of $100,000. (*See* Bank. Op., at 2). Debtor closed on the purchase of the property on December 15, 2003, and, following closing, allowed creditor claims were paid. Although appellant's claim was disputed by virtue of appellee's objections, appellee agreed to pay appellant the sum of $25,000 plus the requisite interest under the Plan. (*Id.*). This payment was in response to an indemnification provision in the Plan, through which appellee agreed to indemnify Goldner for a $25,000 personal guaranty that Goldner issued to appellant for paying $25,000 of the June advance. (*Id.*).

On December 18, 2003, the bankruptcy court conducted a hearing to determine the merit of the claims of Woidislawsky and appellant. (*Id.,* at 18). On May 13, 2004, the bankruptcy court issued an opinion sustaining appellee's objection to appellant's claim in its entirety. (*Id.*). The bankruptcy court also affirmed appellee's objection to Woidislawsky's claim on the basis that this claim was subsumed within appellant's claim. (*Id.,* at 2 n. 1). Appellant timely appealed that decision on May 24, 2004. (*See* Notice of Appeal, attached as Ex. 1 to Appellant's App.).

II. Discussion

**\*4** Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 158(a). In applying the appropriate standard of review, this Court reviews the bankruptcy court's legal determinations *de novo,* its factual findings for clear error, and its exercise of discretion for an abuse thereof. *See, e.g., In re Rashid,* 210 F.3d 201, 205 (3d Cir.2000).

Prior to reaching the substantive merit of appellant's appeal, this Court must first address: (i) appellee's motion to strike certain documents attached to

appellant's appendix in support of its appeal; and (ii) appellee's argument that Woidislawsky lacks standing to pursue this appeal.

A. Motion to Strike

Appellee seeks to strike three documents attached to appellant's appendix. These documents include: (1) power of attorney of Abraham Woidislawsky; [FN1] (2) a petition to open/strike default judgment in *Creative Finishes, Inc. v. MK Lombard Group I, Inc. & HHS Townhomes, LLC;* [FN2] and (3) a petition to open/strike default judgment in *Brickcrafters, Inc. v. MK Lombard Group I, Inc. & HHS Townhomes, LLC.* [FN3] (*See* Appellee Br., at 45- 46). Appellee argues that these items were not before the bankruptcy court at the time of its ruling, and thus, should not be considered by this court in reaching its decision. (*Id.*).

> FN1. This is attached as Exhibit 6.

> FN2. This is attached as Exhibit 23.

> FN3. This is attached as Exhibit 24.

This court agrees in part and disagrees in part. First, with respect to the power of attorney, this document was never introduced into evidence at trial. (*See* Appellant Rpl. Br., at 21). Nor does the docket sheet indicate that the power of attorney, dated December 17, 2003, was filed with the bankruptcy court, despite appellant's assertions otherwise. Accordingly, this Court strikes the power of attorney from the appellant's appendix. *See, e.g., In re Neshaminy Office Bldg. Assocs.,* 62 B.R. 798, 802 (E.D.Pa.1986) (items not before bankruptcy court and not considered by bankruptcy court in rendering decision may not be included in the appellate record).

Second, with respect to the documents filed in related proceedings, this Court on appeal has the power to take judicial notice of these documents. *See, e.g., United States v. Walter,* 510 F.2d 887, 890 n. 4 (3d Cir.1975) (taking judicial notice of briefs and petitions filed on state courts to determine whether petitioner exhausted state remedies); *Landy v. Federal Dep. Ins. Corp.,* 486 F.2d 139, 150-151 (3d Cir.1972); *In re Neshaminy,* 62 B.R. at 802 (E.D.Pa.1986) ("a court may take judicial notice of the record in prior related proceedings and draw reasonable inferences therefrom"). Accordingly, this Court exercises this power of judicial notice and finds that they form part of the record on appeal.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### B. Standing

Appellee argues that Woidislawsky did not properly appeal the bankruptcy court's determination that his claim was duplicative of appellant's claim, and, thus, that Wodislawsky lacks standing in this Court. (*See* Appellee Br., at 45- 46). Silverman, on the other hand, argues that no practical reason exists to deny Woidislawsky standing because the bankruptcy claim was brought on behalf of Silverman and Woidislawsky, the notice of appeal was brought on behalf of Silverman and Woidislawksy, briefing on appeal was jointly performed, and the issue of standing does not influence the outcome of the dispute. (*See* Appellant Rpl. Br., at 21-23).

**\*5** The filing of a notice of appeal is an event of jurisdictional significance. *See, e.g., In re Universal Minerals Inc.,* 755 F.2d 309, 312 (3d Cir.1985). As such, most courts addressing the issue have concluded that absent equitable circumstances, only the party who files a notice of appeal pursuant to Bankruptcy Rule 8001 retains standing to pursue the appeal, regardless of whether the parties are similarly situated. *See Storage Tech. Corp. v. U.S. Dist. Court,* 934 F.2d 244 (10th Cir.1991); *Smith v. Dairymen, Inc.,* 790 F.2d 1107, 1110 (4th Cir.1986) (reversing district court's judgment as to party that do not file notice of appeal to district court, despite filing of appeal by similarly situated creditor); *In re Abdallah,* 778 F.2d 75, (1st Cir.1985). These courts reason that language of Bankruptcy Rule 8001 clearly establishes the jurisdictional requirement that each "aggrieved party" file a separate appeal in order to modify the final order of the bankruptcy court. *See, e.g., Smith,* 790 F.2d at 110.

Assuming that Woidislawsky did not properly file a notice of appeal, equitable circumstances give Woidislawsky standing to appeal the bankruptcy court's opinion. First, the bankruptcy court opinion treated the claims collectively, finding that Woidislawsky's claim was "subsumed" within Silverman's claim. (*See* Bank. Op., attached as Ex. 2 to Appellant's App.). Second, the notice of appeal was filed by appellant Silverman, as "claimant," on behalf of Woidislawsky and Gaskill. (*See* Notice of Appeal, attached as Ex. 1 to Appellant's App.). Third, the statements of issues raised on appeal similarly states that Silverman is acting on behalf of Woidislawsky. (*See* Statement of Issues, attached as Ex. 28 to Appellant's App.). Fourth, granting standing to Woidislawksy does not influence the resolution of the appeal, nor the remedies available to the parties. Accordingly, this Court finds that Woidislawsky has

standing to appeal the bankruptcy court's opinion to the extent that his claim remains subsumed within that of Silverman. [FN4]

> FN4. Since Woidislawsky's claim is subsumed within Silverman's claim, the Court refers to "appellant" in the singular.

### C. Appellant's Arguments

Appellant presents the following arguments on appeal. [FN5] First, appellant argues that the bankruptcy judge erred by construing the agreement as precluding recovery of the $125,000 June advance except through satisfaction of the conditions of ¶ 30. (*See* Appellant's Br., at 36-42; Appellant's Rpl. Br., at 2-9). Second, appellant argues that the bankruptcy judge erred by finding that appellant was not entitled to a return of all advances by virtue of ¶ 12.1 of the agreement. (*See* Appellant's Br., at 15-36). Third, appellant argues that the bankruptcy judge erred by finding that the refund of $25,000 was not an admission of liability for repayment of the $125,000 June advance to appellant. (*Id.,* at 42-45). Fourth, appellant argues that the bankruptcy court erred by finding that certain oral statements by Goldner after the purported termination of the agreement did not constitute an admission of liability by debtor to appellant for a return of the $25,000 June advance and the $32,788 September advance. (*Id.,* at 45-48).

> FN5. At the outset, appellant acknowledges that he waives all issues raised in the appeal, but not properly briefed in his memorandum. (*See* Appellant's Rpl. Br., at 21).

1. The bankruptcy judge did not err by construing the agreement to preclude appellant from recovering the $125,000 advanced pursuant to the June agreement, except by satisfying the conditions of ¶ 30.

**\*6** The bankruptcy judge determined that appellant needed to satisfy the conditions of ¶ 30 before recovering the $125,000 advanced pursuant to the June agreement. [FN6] Appellant does not dispute the conclusion that the conditions of ¶ 30 were not met. [FN7] However, appellant disagrees with the bankruptcy's construction of the agreement--that ¶ 30 was the sole contractual provision permitting recovery of the $125,000 June advance. Instead, appellant contends that it was entitled to recover the $125,000 June advance upon any default pursuant to ¶ 12.1 or ¶ 10.1(b). In support of its construction,

Not Reported in F.Supp.2d                                                                          Page 5
Not Reported in F.Supp.2d, 2005 WL 735993 (E.D.Pa.)
**(Cite as: 2005 WL 735993 (E.D.Pa.))**

appellant argues that the phrase "any sums of money advanced by Purchaser" in ¶ 12.1 and ¶ 10.1(b) covers the sum of $125,000 referenced in ¶ 30. (*See* Appellant's Br., at 36-39).

> FN6. These conditions included: (i) termination of the agreement by seller pursuant to ¶ 4.3, which permitted appellee to terminate the agreement upon the non-occurrence of closing; and (ii) subsequent sale of the property to another party other than through a bankruptcy action or foreclosure proceeding. (*See* Agreement, at ¶ 30).

> FN7. The property was sold by debtor to appellee through a bankruptcy action. (*See* Bank. Op., at 10).

This Court reviews the bankruptcy court's construction of the unambiguous agreement under a *de novo* standard of review. *John F. Harkins Co. v. Waldinger Corp.*, 796 F.2d 657, 659 (3d Cir.1986) (differentiating between contract construction and interpretation, which requires clearly erroneous standard). [FN8] Applying the appropriate standard, this Court affirms the bankruptcy judge's interpretation of the agreement as precluding recovery of the $125,000 June advance except through ¶ 30.

> FN8. Neither party has argued that the bankruptcy court erred by finding the language of the agreement unambiguous. Indeed, although appellant included this issue in its notice of appeal, it was not briefed, and, thus, according to appellant's own logic, waived.

Paragraph 30 states:
This Agreement, when executed by both Seller and Purchaser, shall supersede and render null and void that certain Agreement of Sale dated June 10, 2002 ... and shall constitute a complete and general release of all claims, if any, which either party to said Prior Agreement had, has, or may have ... Notwithstanding the foregoing, Seller acknowledges that it received a deposit and other advances totaling $125,000 from Prior Purchaser pursuant to the Prior Agreement. Without acknowledging that Purchaser has any right to a refund of said $125,000, if Seller elects to terminate this Agreement pursuant to Section 4.3, and thereafter closes a sale of the Premises to any other party (other than pursuant to a Bankruptcy

Action or foreclosure proceeding instituted by Republic or any other creditor or Seller), Seller agrees to pay Purchaser the sum of $125,000.

(*Id.*, at ¶ 30). The effect of the characterization of the $125,000 through ¶ 30 is two-fold. First, the parties did not consider the $125,000 an advance under this agreement, but, instead, an "advance ... pursuant to the Prior Agreement" that had been released as consideration for executing the new agreement. Second, as a consequence of this release, the parties treated the $125,000 under the new agreement as a "sum" that was available upon the satisfaction of certain conditions, rather than as a "refund" of prior "advances."

This characterization of the $125,000 in ¶ 30 has a clear impact on those contractual provisions permitting recovery of "advances" under the agreement, particularly ¶ 12.1 and ¶ 10.1(b). Both ¶ 12.1 and ¶ 10.1(b) limit the recovery of advances to that advanced *in connection with this agreement.* Indeed, the phrase "any sums advanced by Purchaser as set forth in this Agreement" in ¶ 10.1(b) and the phrase "any sums advanced by Purchaser pursuant to this Agreement" in ¶ 12.1 only permit the recovery of "sums advanced" and, furthermore, only "sums advanced" in connection with the new agreement. Because the $125,000 was no longer considered an "advance," nor was it an "advance pursuant to this Agreement," the bankruptcy court properly determined that appellant could not recover the $125,000 pursuant either to ¶ 10.1(b) or ¶ 12.1.

*7 This Court finds no merit to the appellant's argument that the distinction between "any advances" and "Section 2 advances" used throughout the agreement means that "any advances" includes the $125,000 referenced in ¶ 30. (*See* Appellant Rpl. Br., at 1-5). Although it is true that ¶ 4.3 of the agreement limits "all sums advanced" to those described in ¶ 2, this limitation is not equivalent to a finding both that advances under ¶ 2 are different from "any sums advanced" and that "any sums advanced" includes the $125,000 sum. In fact, ¶ 4.3 achieves consistency with ¶ 30, making clear that the $125,000 was not an amount "advanced," but simply a "sum":
Seller shall have the right ... to terminate this Agreement, in which event Seller shall be obligated to repay Purchaser all sums advanced on behalf of Seller pursuant to Section 2, *together with the sum of $125,000,* as more fully described in Section 30 of this Agreement.
(*See* Agreement, at ¶ 4.3) (emphasis added). If the parties intended to permit the recovery of $125,000

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 735993 (E.D.Pa.)
(Cite as: 2005 WL 735993 (E.D.Pa.))

Page 6

pursuant to provisions other than ¶ 30, the parties would have characterized the $125,000 as an "advance" and, more specifically, as an "advance" made pursuant to this agreement.

This Court recognizes that this interpretation generates a $125,000 "incentive" for appellee to default, and then to structure a deal with a third party that circumvents the conditions in ¶ 30. Nonetheless, this was the precise agreement struck by the parties. *See, e.g., Stewart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 662 (Pa.1982) ("it is not the provision of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly"). Furthermore, to find otherwise would render the language of ¶ 30 mere surplusage, an outcome Pennsylvania contract law refuses to countenance. *See, e.g., Tenos v. State Farm Ins. Co.,* 716 A.2d 626, 631 (Pa.Super.Ct.1998) (rules of construction under Pennsylvania law do not permit contractual terms to be treated as surplusage). Consequently, this court affirms the bankruptcy court's construction of the contract.

2. The bankruptcy judge erred in reaching the conclusion that appellant was not entitled to a refund pursuant to ¶ 12.1.

Appellant argues on appeal that the bankruptcy judge committed several errors in reaching the conclusion that appellant was not entitled to the $32,788 advance pursuant to ¶ 12.1. Appellant argues that the bankruptcy court erred in holding that: (i) debtor did not repudiate the agreement by stating that there was "no way" the debtor could obtain MKLG's consent to assume the mortgage pursuant to ¶ 2(a)(ii) of the agreement; (ii) debtor did not prevent appellant's performance by failing to obtain MKLG's consent to assume the mortgage; (iii) appellant's conduct after knowledge of the alleged defaults constituted an implied waiver; and (iv) appellant's failure to provide written notice of default in accordance with ¶ 12.1 precluded recovery of the September advance. The Court agrees in part and disagrees in part.

a. The bankruptcy court did not err in holding that appellee did not anticipatorily repudiate the agreement.

*8 Appellant first argues that the bankruptcy judge erred by finding no anticipatory breach on the part of the debtor. (*See* Pl. Mot., at 15-22). Specifically, appellant argues that the debtor repudiating its obligation under § 2(a)(ii) of the agreement when Mr. Kline notified appellant that there was "no way" that MKLG would assume the mortgage. (*Id* ).

Under Pennsylvania law, an anticipatory breach occurs "where there is an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." *McClelland v. New Amersterdam Cas. Co.,* 322 Pa. 429, 185 A. 198, 200 (Pa.1936). The allegedly breaching party's conduct must be viewed in the context of the relationship, along with subsequent events that tend to shed light on the explicitness of the alleged repudiation. *See, e.g., Edwards v. Wyatt,* 335 F.3d 261, 273-274 (3d Cir.2003). Pennsylvania courts have applied this doctrine in a rigorous manner, finding "anticipatory repudiation only under the most clear-cut and unmistakable instances of refusal to perform." *See, e.g., In re Bradstreet,* 2002 WL 1349588, at *16 (E.D. Pa. June 2002) (collecting cases).

Applying this rigorous standard, the bankruptcy court properly held that the conversation between Kline and appellant did not amount to an absolute, unequivocal inability to perform. The bankruptcy court weighed the testimony and credibility of witnesses, and found that Kline's statements to appellant, in which he stated that "there was no way that MKLG was going to cooperate," were part of a larger, "fluid" context in which debtor could still secure MKLG's consent through a desirable package. (*See* Bankr.Op., at 18). *See, e.g., 2401 Pennsylvania Ave. Corp. v. Fed. of Jewish Agencies of Greater Philadelphia,* 507 Pa. 166, 489 A.2d 733, 737 (Pa.1985) (defendant's statement that it "did not want to occupy space, had no use for it, and would not consider any type of extension without a release" did not constitute clear and unequivocal repudiation of lease agreement because defendant merely preserving legal defense to required performance). Furthermore, Mr. Goldner testified that he believed MKLG would eventually agree to the assumption of the mortgage and reduced letter of credit. (Tr., at 165). Nor did appellant interpret the debtor's statement as an anticipatory repudiation of the agreement, as he continued negotiating with debtor to secure MKLG's consent. (Bankr.Op., at 18). *See, e.g., Gregory v. Correction Connection, Inc.,* 1989 WL 79752, *4 (E.D.Pa. July 14, 1998) ("mere contemplation of actions which may eventually result in a breach cannot constitute a clear unequivocal repudiation"); 8 Summ. Pa. Jur.2d Property § 26:36 (2004) ("the fact that a lessee continues to meet and negotiate with the lessor will support the conclusion that the lessee's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 735993 (E.D.Pa.)
**(Cite as: 2005 WL 735993 (E.D.Pa.))**

Page 7

words and conduct are not an unequivocal refusal to perform"). Based upon the available record, the bankruptcy court's legal conclusion that no anticipatory repudiation occurred was not improper. [FN9]

> FN9. Because this Court agrees with the bankruptcy court's conclusion that the debtor did not repudiate the agreement, this Court need not address appellant's argument that the Court erred by finding, in the alternative, a nullification of this anticipatory repudiation.

b. While correctly finding no anticipatory repudiation, the bankruptcy court erred by failing to consider whether appellant's inability to obtain MKLG's consent at the time of closing breached the agreement.

*9 Although the bankruptcy court found no anticipatory repudiation based upon statements made to appellant *prior* to the closing date, appellee was still required under the terms of the agreement to secure the consent of MKLG for assumption of the mortgage by the closing date, so long as appellant chose to pursue this option. (*See* Agreement, at ¶ 2(a)(ii)). Appellant contends that the bankruptcy judge erred by failing to address this issue. This Court agrees.

The bankruptcy court never considered whether debtor's failure to obtain the consent of MKLG at the time of closing was a breach of the agreement. However, ¶ 2(a)(iii) of the agreement required debtor to obtain the consent of MKLG for appellant to assume the MKLG mortgage prior to closing, so long as appellant chose this option. The record clearly indicates, through the testimony of Kline, that appellant conveyed his intention to debtor to assume the MKLG mortgage. (Tr., at 86-88). [FN10] The record also clearly establishes that debtor did not obtain the consent of MKLG to assume the mortgage prior to closing. (*See* Tr., at 16-17, 20, 167). In fact, while agreeing that no anticipatory repudiation occurred, appellee itself notes that it "might be held to account for any failure to procure MKLG's consent to an assumption." (*See* Appellee Br., at 35). Accordingly, this Court finds that debtor materially breached the agreement on October 30, 2002 by failing to obtain the consent of MKLG. [FN11]

> FN10. This Court notes that the bankruptcy court would not have reached the merit of appellant's anticipatory breach argument if

securing the consent of MKLG was not debtor's contractual obligation and if appellant never notified debtor of its intention to pursue this financing mechanism.

> FN11. Applying the appropriate test for determining whether a breach is "material," this Court finds that debtor's failure to obtain MKLG's consent by closing was a "material" breach of the agreement. *See, e.g., Oak Ridge Constr. Co. v. Tolley,* 351 Pa.Super. 32, 504 A.2d 1343, 1348 (Pa.Super.Ct.1985) (applying factors outlined in Restatement (Second) of Contracts § 241 to determine whether breach is material).

c. The bankruptcy judge erred by failing to consider whether appellee's failure to obtain MKLG's consent pursuant to ¶ 2(a)(ii) excused appellant's duty to close.

Appellant argues that by not recognizing the existence of appellee's breach, the bankruptcy court also failed to recognize the effect of this non-performance on appellant's own obligations. (*See* App. Br., at 25-27). Specifically, appellant argues that the appellee's "default on its obligation to have MKLG agree to assign its mortgage to the Purchaser not only relieved the Purchaser of its obligations under the Agreement, but also made it impossible for the Purchaser to close under the terms of the Agreement by October 30, 2002." (*Id.,* at 25). According to appellant, the bankruptcy court applied the wrong doctrine, the frustration of purpose doctrine, rather than the prevention of performance doctrine. [FN12]

> FN12. Appellant agrees with the bankruptcy court's conclusion that the frustration of purpose doctrine is inapplicable to the contractual dispute, as this doctrine hinges upon unforeseeable, supervening events outside the control of the parties and for which there has been no contractual allocation of liability. (Appellant's Br., at 27). *See* Restatement (Second) of Contracts § 261 (1979) (party's contractual duty may be relieved if duty becomes impracticable as a result of supervening event the non-occurrence of which was a basic assumption of agreement).

The bankruptcy court found that the "frustration of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 735993 (E.D.Pa.)
**(Cite as: 2005 WL 735993 (E.D.Pa.))**

Page 8

purpose" doctrine did not excuse appellant's failure to close because this doctrine was inapplicable. (*See* Bank. Op., at 19-20). The bankruptcy court reasoned that appellant's obligation to close was not rendered impracticable by an unforeseeable, supervening event beyond the parties control. (*Id.,* at 19). The bankruptcy court further reasoned that although appellant's performance may have been rendered more difficult without the assumption of MKLG's mortgage, this did not frustrate the purpose of the contract. (*Id.,* at 20).

*\*10* By applying the frustration of purpose doctrine, rather than the prevention of performance doctrine, the bankruptcy court committed clear error. It is well-settled that a party to a contract may not take advantage of its own wrong-doing, indeed, that "when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure." *Apalucci v. Agora Syndicate, Inc.,* 145 F.3d 630, 634 (3d Cir.1998); *Borough of Nanty-Glo v. American Surety Co. Of New York,* 316 Pa. 408, 175 A. 536, 537 (Pa.1934). This rule is an extension of the principle that a material contractual breach excuses the non-breaching party's duty to perform the remainder of its contractual obligations, absent contractual language otherwise. *See, e.g., Ott v. Buehler Lumber Co.,* 373 Pa.Super. 515, 541 A.2d 1143, 1145 (Pa.Super.Ct.1988) ("the general rule is that a party who has materially breached a contract may not complain if the other party refuses to perform his obligations under the contract"); *Oak Ridge Constr. Co. v. Tolley,* 351 Pa.Super. 32, 504 A.2d 1343, 1346 (Pa.Super.Ct.1985).

It is clear that the bankruptcy court failed to consider this doctrine, despite the fact that the appellant raised this argument in its post-hearing briefs. (*See* Appellant's Brief In Support of Claim, attached as Ex. 7 to Appellant's App., at 28-29). It is also clear from the record that debtor's failure to obtain MKLG's consent to assume the new mortgage prevented appellant from closing on the appropriate date. For instance, appellant only learned of the *possibility* of MKLG's refusal to assume the mortgage after securing Independent Mortgage's commitment letter on October 8, 2002, which conditioned financing on the release of certain lots from the MKLG mortgage and on appellant being able to assume the mortgage. (Tr., at 96). Not surprisingly, appellant was unable to raise an additional $1.7 million from its lender within a short period of time and without additional collateral. (Tr.,

at 88-89, 122). Accordingly, debtor's failure to secure MKLG's consent for appellant to assume the mortgage placed an insurmountable barrier to appellant's closing on October 30, 2002. *See, e.g., Craig Coal Min. Co. v. Romani,* 355 Pa.Super. 296, 513 A.2d 437, 440 (Pa.Super.Ct.1986) ("A party may not take advantage of any insurmountable obstacle placed, by himself, in the path of the other party's adherence to an agreement. By preventing performance he also excuses it.").

In finding that debtor's failure to obtain the consent of MKLG prevented debtor from performing under the agreement, this Court rejects appellee's argument that appellant had the opportunity to negotiate financing to pay the outstanding balance. (*See* Appellee Br., at 36). Such an argument is undermined by the lack of a finding of anticipatory repudiation, which carries the implication that appellant still *expected* debtor to secure MKLG's consent prior to closing, as required by ¶ 2(a)(ii) of the agreement. Simply put, appellant received no unequivocal notice of debtor's inability to obtain the consent of MKLG prior to closing, and, with no opportunity to obtain additional financing from its lender or any other lender, appellant was excused from its obligation to tender the purchase price at closing. *See, e.g., McDermott v. Party City Corp.,* 11 F.Supp.2d 612, 621 (E.D.Pa.1998) ("If a party acts to hinder the satisfaction of the condition, the condition is excused."); *Romani,* 513 A.2d at 440. [FN13]

> FN13. In reaching this conclusion, the Court rejects appellee's argument that debtor did not "unilaterally" prevent appellant from tendering the purchase price. (*See* Appellee Br., at 35).

2. The bankruptcy judge erred by finding that appellant impliedly waived debtor's default by continuing to negotiate with debtor after knowledge of the breach.

*\*11* The bankruptcy court found that the seller impliedly waived any default by continuing to negotiate with seller after knowledge of the breach. (*See* Bank. Op., at 16-17). This Court's findings both that appellee breached the agreement by not securing the consent of MKLG and that this breach excused appellant from closing on October 30, 2003 undermine the bankruptcy court's legal conclusion that this breach was waived.

Under Pennsylvania law, a waiver is the act of "intentionally relinquishing or abandoning some

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 735993 (E.D.Pa.)
(Cite as: 2005 WL 735993 (E.D.Pa.))

Page 9

known rights, claim, or privilege." *Brown v. City of Philadelphia,* 186 A.2d 399, 360 (Pa.1962). Unlike an express waiver, which is embodied in an agreement, an implied waiver occurs when words or conduct express an intent not to exercise a known contractual right and when the person claiming the waiver was misled and prejudiced by this behavior. *See Brown,* 186 A.2d at 401 (implied waiver applies when person claiming waiver demonstrates prejudice); *Schifalacqua v. CNA Ins.,* 567 F.2d 1255, 1258 (3d Cir.1977); *Nat'l Data Payment Systems, Inc. v. Meridian Bank,* 18 F.Supp.2d 543, 548 (E.D.Pa.1998). On the other hand, when a plaintiff is unable to demonstrate prejudice in relying upon conduct evincing waiver, the implied waiver standard has not been met. *See Ernst v. Curtis T. Bedwell & Sons, Inc.,* 506 F.Supp. 1324, 1329-1330 (E.D.Pa.1981) (no waiver of breach when contractor approves subcontractor's work on project for 27 days after knowledge of subcontractor's breach because subcontractor experienced no prejudice during this time).

In contrast to the bankruptcy court's findings, the record does not indicate that appellant's conduct after notice of debtor's failure to obtain the consent of MKLG constitutes an implied waiver. First, continued negotiations over performance for less than a week after a default does not evince an "intent" not to exercise a known contractual right. *See, e.g., Ernst,* 506 F.Supp. at 1330 (27-day period between knowledge of breach and termination of contract does not constitute implied waiver). Nor does a desire against termination signal an intent not to pursue remedies for a contractual breach. *See, e.g., Times Mirror Mag. v. Field & Stream,* 103 F.Supp.2d 711, 736 (S.D.N.Y.2000) ( "A non-breaching party who elects to continue to perform [rather than to terminate] a contract may still sue later and recover damages solely for the breach of the agreement, provided that it gives notice of the breach to the breaching party."). [FN14] Furthermore, in this instance, the negotiations demonstrated appellant's intent to pursue the contractual arrangement only to the extent that an adequate arrangement to compensate for debtor's breach could be negotiated, indeed, only to the extent that the purchase price would be reduced by the amount of the mortgage. [FN15] (*See* November 5, 2002 Letter, attached as Ex. 18 to Appellant's App.). Finally, because debtor starting looking for a new purchaser prior to the closing date (Tr., at 36, 151) and because debtor seems to have located a third-party for the sale of the property on November 7, 2002 (Tr., at 116-117), debtor did not suffer prejudice by virtue of appellant's

conduct after the breach. *See, e.g., Schifalacqua,* 567 F.2d at 1359 (no implied waiver unless party claiming waiver suffers prejudice). Indeed, it can hardly be said that appellant's post-breach conduct caused debtor to change detrimentally its position, particularly when debtor purported to terminate the agreement one day after its own breach (on the closing date), when debtor located a new purchaser, and when subsequent negotiations between debtor and appellant centered around a whole new contractual arrangement (*See* November 5, 2002 Letter, attached as Ex. 18 to Appellant's App.). *See, e.g., 2101 Allegheny Assoc. v. Cox Home Video, Inc.,* 1991 WL 225008, at *9 (E.D.Pa. Oct.29, 1991) (no implied waiver when defendant fails to provide notice of cancellation of lease agreement despite knowledge of plaintiff's inability to complete construction on time because no evidence suggests that plaintiff "changed its position as a consequence of the alleged waiver").

> FN14. Any negotiations concerning the possibility of entering a new agreement lasted for less than a week, and occurred after debtor purported to terminate the agreement, thereby undermining the quality of the negotiations, any prejudice that debtor experienced, and any intent on behalf of appellant to waive its contractual remedies.

> FN15. Indeed, in contrast to appellee's arguments, a desire not to terminate an agreement is not coterminous with a desire to waive a contractual breach. (Appellee's Br., at 27)

3. Remand is appropriate because the bankruptcy's court's analysis concerning notice may be influenced by this Court's finding that debtor's breach of the agreement excused appellant's obligation to close on October 30, 2002.

*12 The bankruptcy judge did not find that debtor breached the agreement at closing by virtue of failing to obtain the consent of MKLG. Nor did the bankruptcy judge find that the appellant's failure to close was excused by virtue of debtor's breach. Instead, the bankruptcy court concluded that even if the debtor breached the agreement by not securing the consent of MKLG, the appellant excused this breach by failing to provide written notice in accordance with ¶ 12.1.

The bankruptcy court's discussion of notice took as its starting point that appellant knew of "almost all"

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 735993 (E.D.Pa.)
**(Cite as: 2005 WL 735993 (E.D.Pa.))**

Page 10

of debtor's defaults, including the refusal of MKLG to consent to appellant's assumption of the mortgage, prior to closing. (*See* Bankr.Op., at 14-16). Using this foundation, the bankruptcy court then concluded that appellant's failure to provide written notice of the default pursuant to ¶ 12.1 precluded the recovery of advances under this same paragraph. (*Id.*). However, the assumption on which the waiver analysis is predicated--that appellant knew of debtor's default pursuant to ¶ 2(a)(ii) prior to closing and could (or should) have provided the requisite notice--is contradicted by the bankruptcy court's additional conclusion, affirmed by this Court, that no anticipatory repudiation occurred prior to closing. Consequently, the bankruptcy court's analysis of whether failure to provide notice precluded recovery from recovering an advance pursuant to ¶ 12.1 did not take into consideration the appropriate timing of debtor's breach, as well as its effect of discharging the appellant's obligation to close on October 30, 2002.

This Court therefore remands this matter back to the bankruptcy court to consider the effect both of the timing of the breach (at the date of closing) and of the timing of debtor's termination letter on appellant's failure to provide written notice of the breach. The bankruptcy court must also consider whether the October 31, 2003 termination letter was effective, and, if not, the impact of the letter on appellant's rights under the agreement. Finally, to the extent that the prior opinion failed to address directly this issue, the bankruptcy court must evaluate whether debtor breached the representations and warranties contained within ¶ 10.2(h), the effect of this type of breach, and whether appellant was required to provide notice of this breach pursuant to ¶ 12.1 based upon the language of the agreement and the timing of the breach.

III. The bankruptcy court correctly concluded that payment of $25,000 to appellant Silverman did not constitute an admission of liability for payment of the entire $125,000 June advance.

Appellant claims that the payment of $25,000 to appellant Silverman after the termination of the agreement and through the Plan was an admission of liability for $25,000, and, because no distinction exists between the obligation to refund the $25,000 advance and the $100,000 advance, an admission of liability for the entire $125,000 figure. (*See* Appellant Br., at 42-45). Appellee, on the other hand, argues that the $25,000 payment was not an admission of liability, but, instead, payment to satisfy a $25,000

personal guaranty made by Goldner to appellant in the event that appellant was not reimbursed for the $25,000 loan under the Plan. (*See* Appellee Br., at 37-40).

**\*13** The bankruptcy court correctly found that the $25,000 payment through the Plan was not an admission of liability on behalf of appellee. This Court finds persuasive the following reasons in support of the bankruptcy court's conclusion. First, nothing in the record or the Plan can be characterized as an admission of liability by debtor to appellant for the $125,000 June advance. (*See* Bankr.Op., at 23). Instead, the payment of $25,000 to appellant was the debtor's method of indemnifying Goldner for personally guaranteeing appellant's $25,000 loan to debtor. (*Id.;* Tr., at 155-156). Furthermore, assuming that payment of the $25,000 was used for the repayment of one advance made pursuant to the June agreement, this repayment is not tantamount to an admission that the other $100,000 advance is owed. (*Id.*). Finally, regardless of the intent behind the repayment, appellant's entitlement to the June advance was expressly waived through ¶ 30 of the agreement. (*Id*).

Appellant cites no cases to challenge the bankruptcy court's analysis. Specifically, appellant cites no authority for the proposition that payment of money, without more, constitutes an admission of liability. Nor does appellant cite authority to establish that a debtor's payment of one advance constitutes an admission that a previous advance is also owed. Finally, appellant fails to acknowledge the preclusive impact of ¶ 30 of the agreement on any contention that appellant was entitled to a refund of the $125,000 without meeting the conditions of ¶ 30. Consequently, this Court rejects appellant's argument, and affirms the bankruptcy court's holding on this issue.

IV. The bankruptcy judge correctly concluded that debtor's statements to appellant did not constitute an admission of liability for the return of the $25,000 June advance and the $32,788 September advance.

Appellant argues that the bankruptcy judge erred by failing to find that certain statements from Goldner to appellant immediately after the purported termination of the agreement and at the time of the confirmation hearing constituted an admission that debtor was obligated to return the $25,000 and $32,788 advances to appellant. (*See* Appellant's Br., at 45-47). Appellant argues that Goldner promised to return the $57,788, which was documented in a November 8,

2002 letter to debtor, and that appellee's refunding of $25,000 pursuant to the Plan constituted partial performance on debtor's promise to repay. (*See* November 8, 2002 Letter, attached as Ex. 19 to Appellant's App.).

The bankruptcy court found that any oral statements from Goldner to appellant concerning the return of $57,788 were not enforceable and, if so, were barred by Pennsylvania's parol evidence rule. (*See* Bankr.Op., at 22). The bankruptcy court noted that the agreement contained an integration clause; and provided that subsequent agreements seeking to modify the agreement needed to be in writing and signed by the parties. (*Id.; see Agreement,* at § 16.1, 16.2). Applying these contractual provisions, the bankruptcy court found that the lack of a written and executed modification of the agreement was fatal to appellant's argument. (*Id* ). Furthermore, assuming *arguendo* that consideration of the oral statements was permissible, the bankruptcy court construed these statements "to be nothing beyond a mere promise *to try* to repay Silverman out of the proceeds of future deals." (*Id.;* Tr., at 153-154) (emphasis added).

*\*14* This Court agrees. To the extent that Goldner's statements modified the agreement, such as by promising the return of $25,000 (as part of the June advance) to appellant despite not satisfying the conditions of ¶ 30 of the agreement, these oral statements were ineffective by virtue of ¶ 16.1 of the agreement. On the other hand, to the extent that these statements did not modify the language of the agreement, this Court agrees with the bankruptcy court's finding that they signaled merely a desire "to try" to repay appellant the amount of $57,788. The expression of this desire to repay appellant through future agreements was not equivalent to an admission of liability on behalf of debtor. Indeed, Goldner's statements hardly amounted to a confession that debtor breached the terms of the agreement, that appellant met the contractual prerequisites to recovery, and that appellant was entitled to a return of the $32,788 pursuant to ¶ 12.1 of the agreement. [FN16] Finally, the Court emphasizes that Goldner's statements are inadmissible for purposes of interpreting the unambiguous language of the agreement. *See, e.g., Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1010 (3d Cir.1980) (parol evidence not admissible to interpret unambiguous contract).

> FN16. The Court also notes that appellant fails to provide case law holding that

statements from a partner concerning the liability of the partnership, without more, establishes *per se* the liability of the partnership for breach of contract.

IV. Conclusion

Based upon the foregoing, this Court reaches the following conclusions. First, this Court affirms the bankruptcy court's construction of the agreement as precluding recovery of the $125,000 except upon satisfaction of the conditions of ¶ 30. Second, this Court affirms the bankruptcy court's finding of no anticipatory repudiation; but, finding both that debtor breached the agreement at the time of closing by failing to secure the consent of MKLG and that this breach excused appellant's obligation to close on October 30, 20002, this Court remands the case back to the bankruptcy court to consider whether appellant's failure to comply with the notice provisions of ¶ 12.1 was excused by virtue of the timing of debtor's breach. On remand, the bankruptcy court must also consider whether debtor breached the representations and warranties of ¶ 10 . 2(h), whether debtor was required to provide notice of this breach, and, if so, the effect of the timing of this breach on appellant's failure to provide notice. Third, this Court affirms the bankruptcy court's finding that the Plan's refund of $25,000 to appellant was not an admission of liability for the remainder of the $125,000 advanced pursuant to the June agreement. Fourth, this Court affirms the bankruptcy court's finding that Goldner's statements to appellant did not constitute an admission of liability for the $32,788 September advance and $25,000 of the June advance. An appropriate order follows.

*ORDER*

AND NOW, this 31st day of March 2005, upon consideration of Appellant's Brief (Doc. No. 9), Appellee's Response (Doc. No. 10), and Appellant's Reply Brief (Doc. No. 11), it is hereby ORDERED that the May 14, 2005 opinion of the bankruptcy court is affirmed in part and vacated in part. It is hereby further ORDERED that the matter is remanded to the bankruptcy court for further proceedings consistent with this opinion.

Not Reported in F.Supp.2d, 2005 WL 735993 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2695990 (Trial Motion, Memorandum and Affidavit) Brief of Appellee (Sep. 15, 2004)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 735993 (E.D.Pa.)
**(Cite as: 2005 WL 735993 (E.D.Pa.))**

• 2:04cv02700 (Docket) (Jun. 18, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citation                    Search Result          Rank 1 of 1            Database
Not Reported in A.2d                                                      DE-CS-UPD
Not Reported in A.2d, 2002 WL 31999352 (Del.Com.Pl.)
**(Cite as: 2002 WL 31999352 (Del.Com.Pl.))**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
                   Court of Common Pleas of Delaware.
             COMMERCIAL UNION INSURANCE COMPANY, Plaintiff,
                                  v.
                 S & L CONTRACTORS, INC., Defendant.
                       No. CIV.A.01-02-0083.
                       Submitted Nov. 8, 2002.
                       Decided Nov. 8, 2002.
  Edward F. Kafader, Esquire, Ferry, Joseph & Pearce, P.A., Wilmington, DE, for
plaintiff.
  Thomas P. Leff, Esquire, Casarino, Christman & Shalk, P.A., Wilmington, DE, for
defendant.
           Upon Defendant's Motion for Summary Judgment.
  TRADER, J.
  *1 In this civil action for breach of warranty and negligence, I conclude that
the breach of warranty claim must be referred to arbitration. I also hold that
Commercial Union's breach of warranty claim is barred because the homeowners
failed to comply with the notice provisions of their warranty. As to the
plaintiff's negligence claim, the three year statute of limitations found in 10
Del.C. Sec. 8106 is applicable to that claim rather than the two year statute of
limitations set forth in 10 Del.C. Sec. 8107. Therefore, Commercial Union's
negligence claim is not time barred. S & L Contractors' (S & L) motion for
summary judgment is granted in part and denied in part.
  On January 17, 1997, Paul and Rosemary Laikowski (Laikowski) purchased a new
home from S & L. The sales agreement provided for a one year warranty effective
March 6, 1997, for all materials and workmanship. A claim for water damage as a
result of the leak involving improper installation of doors and windows is a
deficiency that specifically falls within the one year warranty period. Although
Laikowski presented a list of deficiencies to S & L on December 12, 1997 and on
February 27, 1998, he did not present any claim relating to water damage. On
August 24, 2000, Laikowski presented a claim for water damage to S & L. Since
the claim was presented two years after the warranty had expired, S & L refused
to pay the claim. On or about August 14, 2000, Commercial Union issued an
insurance policy to the homeowners that covered their new home. In September
2000, the Laikowskis made a claim under their homeowner's policy for water
damage to the kitchen area flooring and Commercial Union paid $1840.22 for the
cost of making necessary repairs. Thereafter, Commercial Union filed this court
action against S & L to recover that amount and S & L has filed a motion for
summary judgment.
              Standard for Motion for Summary Judgment
  Summary judgment is appropriate when there are no material issues of fact.
Merrill v. Crothall-American, 606 A.2d 96 (Del.Supr., 1992). As to the breach of
warranty, I find there is no material issue of fact.
           Applicability of the Arbitration Provision

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
**(Cite as: 2002 WL 31999352, \*1 (Del.Com.Pl.))**

 There is "a presumption in favor of arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Worthy v. Paine, Del. Ch., C.A. No. 16027, ltr. op. at 2, Steele, V.C. (February 12, 1998). Once it is determined that the dispute properly falls within the scope of arbitration clause, a Delaware court has no discretion in its enforcement. Westendorf v.. Gateway, 2000, 2000 WL 307369 at 4, Steele, V.C. (Del. Ch.). Thus, where the terms of the arbitration clause are clear and specific and absent showing that enforcement "would work a fraud upon [the parties] or deprive them of substantial justice, there is no sufficient reason to refuse an enforcement of their voluntary agreement." Nelson v. Allstate Insurance Co., 298 A 2.d 337, 338 (Del.Supr., 1972).

 **\*2** In the case before me, S & L claims that Laikowski was required to arbitrate his dispute with S & L as provided by the terms of the warranty. The warranty provision provides as follows: "Any and all claims, disputes and controversies arising under or relating to this Agreement, including without limitation, any claim of breach of contract ... shall be submitted to arbitration by and pursuant to the rules of Construction Arbitration Services, Inc. in effect at the time of the request for arbitration." The terms of the arbitration agreement are clear and specific, and the Laikowski is required to arbitrate his claim against S & L under the above quoted arbitration clause.

          The Binding Effect of the Arbitration Agreement On the Subrogee
 Under Delaware law, general rules of contract apply to parties entitled to the benefits and burdens of agreements to arbitrate. Falcon Tankers, Inc. v. Litton System., 300 A.2d 231 (Del.Super ., 1972). Thus, a person must be a party to or in privity with a party to an arbitration agreement in order to invoke its provision. Subrogation is defined as "a substitution of one party in place of another, with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to a debt or claim and its rights and remedies." Wallis v. S.S.P. Combs, Jr., Agency, 565 A.2d 1384 (Del.Super., 1988)

 As subrogee, Commercial Union stands in the Laikowski's shoes and is subject to all defenses S & L may raise against Laikowski. Since S & L could raise the defense of improper venue against Laikowski, the defense is valid and enforceable against Commercial Union. Therefore, the motion for summary judgment as to the breach of warranty claim is granted.

             Compliance with Notice Provisions of the Warranty
 S & L also contends in its motion for summary judgment that the homeowners failed to comply with the notice provisions set forth in the Home Buyers Warranty Booklet. S & L's contention is correct. The homeowners were required by the terms of the warranty to file notice of the deficiency not later than April 5, 1998. Since the homeowners did not present a list of deficiencies relating to water damage until August 2000, summary judgment must be granted on Commercial Union's claim for breach of warranty.

 Commercial Union's Negligence Claim and the Applicable Statute of Limitations
 S & L contends that Commercial Union's negligence claim is governed by 10 Del.C. Sec. 8107. S & L's contention is incorrect. Sec. 8107 applies to damage to personal property. I conclude that 10 Del.C. Sec. 8106 is applicable in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
**(Cite as: 2002 WL 31999352, \*2 (Del.Com.Pl.))**

case before me. Section 8106 provides in pertinent part as follows:
  "No action to recover damages ... caused by an injury unaccompanied by force or
  resulting indirectly from the act of the defendant shall be brought after the
  expiration of three years from the accruing of the cause of such action."
   **\*3** In Nardo v. Guido DeAscanis & Sons, 254 A.2d 254 (Del.Super., 1969), the
court applied a three year statute of limitations to a claim involving the
negligent construction of a residence. See also Dinen v. Stella, 1975 WL 144597,
DiSabatino, J (Del.Com.Pl.).; and Estall v. John E. Campanelli & Sons, 1993 WL
189500, Del Pesco, J. (Del.Super.). The three year statute of limitations found
in Sec. 8106 is applicable to injury to realty.
 The plaintiff's cause of action arises from the time of discovery. It appears
that the water leak was first discovered around August of 2000 and the cause of
action was filed in February 2001. Under those circumstances there is at least a
material issue of fact as to when the defect was discovered. Therefore, S & L's
motion for summary judgment as to the negligence claim is denied.
 In summary, defendant's motion for summary judgment is granted as to Commercial
Union's breach of warranty claim but it is denied as to its negligence claim.
  IT IS SO ORDERED.
 Not Reported in A.2d, 2002 WL 31999352 (Del.Com.Pl.)
END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2545300 (W.D.Pa.)
(Cite as: 2005 WL 2545300 (W.D.Pa.))

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
Martha J. FUNKHOUSER, Plaintiff,
v.
CHI-CHI'S, INC., Defendant,
v.
CASTELLINI COMPANY, LLC, Third-Party
Defendant.
**No. 02:05CV638.**

Oct. 7, 2005.
Edward J. Balzarini, Jr., Balzarini, Carey & Watson,
Pittsburgh, PA, for Plaintiff.

Douglas J. Billings, Frederic L. Gordon, Rhonda J.
Holmes, Gordon & Holmes, San Diego, CA; James
R. Miller, Christopher T. Lee, Dickie, and Shannon
E. Smith, McCamey & Chilcote, Pittsburgh, PA, for
Defendant.

MEMORANDUM ORDER

MCVERRY, J.

*1 Presently before the Court are the following:

• MOTION TO DISMISS filed by Third Party
Defendant Castellini Company, LLC, with brief in
support (*Document Nos. 10 and 11* ), the brief in
opposition filed by Third-Party Plaintiff Chi-Chi's,
Inc. (*Document No. 17* ), and the Reply
Memorandum filed by Third-Party Defendant
Castellini Company (*Document No. 25* ). For the
reasons that follow, the Motion will be granted.

Since its adoption in *Crosley Corp. v. Hazeltine
Corp.*, 122 F.2d 925 (3d Cir.1941), the first-filed rule
has been employed by the courts in the Third Circuit
to enjoin, where appropriate, "the subsequent
prosecution of 'similar cases ... in different federal
district courts.' " *EEOC v. University of
Pennsylvania*, 850 F.2d 969, 971 (3d Cir.1988)
(quoting *Compagnie Des Bauxites De Guinea v.
Insurance Co. of North America*, 651 F.2d 877, 887

n. 10 (3d Cir.1981)). The first-filed rule simply
dictates that, in cases of federal concurrent
jurisdiction involving the same parties and issues, the
court of first-filing must proceed to decide the matter.
*EEOC*, 850 F.2d at 971. Although district courts do
have discretion in applying the first-filed rule, district
courts have adopted a policy which requires the
existence of unusual or exceptional circumstances
before a court may choose to depart from the rule.
*See Berkshire International Corp. v. Marquez*, 69
F.R.D. 583, 586 (E.D.Pa.1976).

Circumstances which may justify a departure from
the first-filed rule include: 1) bad faith on the part of
plaintiff in the first-filed action; 2) forum shopping
being a motivation for the filing of the first action; 3)
the second filed action being further developed than
the first at the time the motion is made; and 4) the
filing of the first suit in one forum to preempt the
opponent's imminent filing of a suit in a different,
less favorable forum. *See EEOC*, 850 F.2d at 976
(declining to apply the first-filed rule after
concluding that defendant had filed its prior action in
the District of Columbia in order to avoid
unfavorable precedent in the Third Circuit).

In its response to the present motion, Third-Party
Plaintiff Chi-Chi's, Inc. ("Chi-Chi's") attempts to
persuade the Court that, due to the existence of
several special circumstances, the first-filed rule
should not be enforced to enjoin it from prosecuting
its third party action against Castellini Company,
LLC in this district.

First, Chi-Chi's argues that although the Delaware
bankruptcy action has been brought in the name of
"Chi-Chi's," that claim was brought by one of the
Company's insurance companies whereas the instant
case was brought by the attorneys retained directly by
Chi-Chi's. Therefore, according to this argument, the
parties in the two actions are not identical.

Second, Chi-Chi's argues that the balance of
convenience "overwhelmingly favor the exercise of
jurisdiction by this Court." Br. at 12. Third, Chi-Chi's
argues that this "Court's familiarity with the subject
matter of this action provides an additional basis for
denial of Castellini's motion." Last, Chi-Chi's argues
that "this action is likely to proceed more rapidly than
Empire's Delaware Action." *Id.* at. 15.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2545300 (W.D.Pa.)
**(Cite as: 2005 WL 2545300 (W.D.Pa.))**

**\*2** Chi-Chi's, however, has failed to persuade the Court that any circumstances exist in this matter which would justify a departure from the first-filed rule. *EEOC,* 850 F.2d at 976. In addition to both claims being brought solely in the name of Chi-Chi's, Inc., both assert the "same rights" through the same six contractually based theories of recovery, both assert the "same facts" and claim the same harm, and both demand the same "relief" from Castellini. The Court, therefore, concludes that pursuant to the first-filed rule, the Third-Party Complaint filed against Castellini in this Court should be dismissed.

AND NOW, this 7th day of October, 2005, it is hereby ORDERED, ADJUDGED AND DECREED that pursuant to the first-filed ruled the Third-Party Complaint of Defendant/Third-Party Plaintiff Chi-Chi's, Inc. against Castellini Company is hereby DISMISSED forthwith.

Not Reported in F.Supp.2d, 2005 WL 2545300 (W.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:05cv00638 (Docket) (May. 09, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| CHI-CHI'S, INC., et al., | : | Case No. 03-13063 |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | Adv. Pro. No. 05-52726 |
| SYSCO CORPORATION and | : | |
| THE SYGMA NETWORK, INC., | : | |
| | : | |
| Appellants, | : | Civil Action No. 06-169-KAJ |
| | : | |
| v. | : | |
| | : | |
| CHI-CHI'S, INC., | : | |
| | : | |
| Appellee. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, Jeffrey R. Waxman, certify that I am not less than 18 years of age, and that

service of the attached REPLY BRIEF OF SYSCO CORPORATION AND THE SYGMA

NETWORK, INC. IN SUPPORT OF THEIR APPEAL OF THE BANKRUPTCY COURT'S

JANUARY 18, 2006 ORDER FINDING THAT RULE 41 DOES NOT BAR FURTHER

PROCEEDINGS AGAINST SYSCO CORPORATION AND THE SYGMA NETWORK, INC.

was made on June 23, 2006 upon the parties listed below:

| VIA HAND DELIVERY | VIA FIRST CLASS MAIL |
|---|---|
| Laura Davis Jones, Esquire<br>Pachulski, Stang, Ziehl, Young, Jones &<br>Weintraub P.C.<br>919 North Market Street, 16th Floor<br>Wilmington, DE 19801 | Frederic L. Gordon, Esquire<br>Gordon & Holmes<br>223 West Date Street<br>San Diego, California 92101-3571 |
| David M. Klauder, Esquire<br>Office of the U.S. Trustee<br>844 King Street, Room 2207<br>Wilmington, DE 19801 | William N. Nobel, Esquire<br>Irell & Manella, LLP<br>840 Newport Center Drive, Suite 400<br>Newport Beach, CA 92660-6324 |
| Kevin Gross, Esquire<br>Rosenthal, Monhait, Gross & Goddess, P.A.<br>919 Market Street, Suite 1401<br>Wilmington DE 19899-1070 | Gary Becker, Esquire<br>Dinsmore & Shohl LLP<br>255 East Fifth Street<br>Cincinnati, OH  45202 |
| Bernard George Conaway, Esquire<br>Fox Rothschild, LLP<br>Citizens Bank Building, Suite 1300<br>919 North Market Street<br>Wilmington, DE 19899-2323 | |

Under penalty of perjury, I declare that the foregoing is true and correct.

_____
Jeffrey R. Waxman (No. 4159)